1  ROBBINS UMEDA LLP
   MARC M. UMEDA (197847)
2  mumeda@robbinsumeda.com
   GEORGE C. AGUILAR (126535)
3  gaguilar@robbinsumeda.com
   JULIA M. WILLIAMS (244400)
4  jwilliams@robbinsumeda.com
   600 B Street, Suite 1900
5  San Diego, California 92101
   Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991

7  MARK C. GARDY
   mgardy@gardylaw.com
8  JENNIFER SARNELLI
   jsarnelli@gardylaw.com
9  KELLY A. NOTO
   knoto@gardylaw.com
10 GARDY & NOTIS, LLP
   560 Sylvan Avenue
11 Englewood Cliffs, NJ 07632
   Telephone: (201) 567-7377
12 Facsimile: (201) 567-7337

13 Co-Lead Counsel for Plaintiffs

14

15                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
16                        SAN JOSE DIVISION

17 IN RE CELERA CORP. DERIVATIVE          ) Case No. CV 10-02935 JW
   LITIG.                                 )
18 _____ )
                                          ) **CONSOLIDATED VERIFIED**
19 This Document Relates To:              ) **SHAREHOLDER DERIVATIVE**
                                          ) **COMPLAINT FOR BREACH OF**
20        ALL ACTIONS                     ) **FIDUCIARY DUTY, WASTE OF**
                                          ) **CORPORATE ASSETS, AND UNJUST**
21                                        ) **ENRICHMENT**
                                          )
22 _____ ) **JURY TRIAL DEMAND**

23

24

25

26

27

28

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT   CASE NO. CV 10-02935 JW

Plaintiffs Alan R. Khan and Betty Greenberg ("Plaintiffs") bring this action derivatively on behalf of nominal defendant, Celera Corporation ("Celera" or the "Company"), and allege upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by Celera shareholders on behalf of the Company against certain of its officers and directors (the "Defendants"), seeking to remedy Defendants' violations of state law, including their breaches of fiduciary duties, waste of corporate assets, and unjust enrichment that occurred between April 24, 2008 and July 22, 2009 (the "Relevant Time Period"), and caused substantial losses to the Company including damage to its reputation and goodwill.

2.      Celera's shares once traded as a tracking stock when it was a wholly-owned subsidiary of Applera Corporation, now known as Applied Biosystems, Inc. ("Applera").  On July 1, 2008, however, Celera split-off from Applera and became an independent company (the "Split-Off").

3.      Celera is now a publicly traded healthcare business headquartered in Alameda, California that delivers personalized disease management through a combination of products and services.  The Company operates in three segments:  (i) the Lab Services segment; (ii) the Products segment; and (iii) the Corporate segment.

4.      Celera's Lab Services segment offers clinical laboratory tests and disease management services to healthcare providers to help physicians improve cardiovascular disease treatment and provide cardiovascular disease prevention services.  It is the most important division of the Company, accounting for over 60% of its revenue.  The Lab Services segment is operated by Berkeley HeartLab, Inc. ("BHL"), a subsidiary of Celera, which Celera acquired in October 2007.  This action arises out of Defendants' misleading statements concerning the Company's Lab Services segment during the Relevant Time Period.

5.      In particular, each of the Defendants made or authorized false and misleading statements regarding Celera's allowance for losses, its bad debt expense, the amount of

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT     CASE NO. CV 10-02935 JW

1  goodwill the Company carried, and its earnings guidance.  Defendants manipulated the

2  Company's financial statements in an attempt to downplay the Lab Service segment's actual

3  losses; losses Defendants were aware of or reckless in not properly identifying at the time the

4  statements were issued, as detailed below.

5     6.  Throughout the Relevant Time Period, Defendants also repeatedly assured

6  investors that Celera could increase the amount of its Lab Services business that was under

7  contract, which would make its ability to collect on its receivables more predictable and less

8  costly and time consuming.  However, at the time they made these assurances, Defendants

9  knew or were reckless in not knowing that the Lab Services segment was not and could not

10  increase its business under contract and that Celera had outstanding receivables that would

11  never be collected, even from its contract customers.

12     7.  In particular, during the quarter ending June 30, 2008, the beginning of the

13  Relevant Time Period, Defendants caused the Company to record $4.3 million in losses, or bad

14  debt expense, representing 10.1% of the Company's revenue for the quarter, a percentage

15  within industry norms for a comparable lab services business of Celera's size.

16     8.  Nearly one year later, on May 6, 2009, Defendants' caused Celera to take a

17  slightly increased bad debt expense of $5.9 million, representing 11.2% of its revenue for that

18  period, a percentage still within industry norms.  In response to the increase, DeBlasi stated

19  that the Company was "aggressively implementing measures to address these issues."

20     9.  These  announcements were bolstered by the additional public statements of

21  defendants Kathy Ordonez ("Ordonez"), Celera's Chief Executive Officer, Joel R. Jung

22  ("Jung"), Celera's Chief Financial Officer until he resigned in April of 2009, and Ugo DeBalsi

23  ("DeBlasi"), Celera's Chief Financial Officer from April of 2009 until his resignation, effective

24  November 2010, who misled the public by: (i) repeatedly stating throughout the Relevant Time

25  Period that they were "pleased" with the Lab Services segment; (ii) repeatedly concealing and

26  intentionally downplaying Celera's actual bad debt expense and the amount of accounts

27  receivable that were well overdue and known to be uncollectible; and (iii) misleading the

28  public by stating that they had implemented "a concerted program to improve collections at

BHL," when at all times they knew or were reckless in not knowing that a large majority of the outstanding receivables had been outstanding for a significant and unreasonable period of time and were uncollectible.

10. Indeed, just three months later, Celera was forced to disclose that it would have to write off $40.1 million in bad debt, representing 48.6% of its revenue for the quarter ending June 27, 2009 – approximately four times the industry norm for a comparable Lab Services business of Celera's size.

11. Specifically, on July 22, 2009, the Company announced in its second quarter 2009 results:

> ***Lab Services revenues were adversely affected by lower than anticipated sample volume due to broad economic pressures, lost business as a result of the Company's efforts to collect aged receivables, and the denial of reimbursement on a number of legacy BHL tests by certain payors in some regions***.

> *   *   *

> ***Celera expects to record significant charges in the second quarter of 2009 for bad debt expense and impairment of goodwill and intangible assets.  Celera expects to have 2009 revenues significantly below its present guidance for the year and hereby withdraws its 2009 guidance***.[1]

12. Defendants admitted that their previous earnings guidance for the Company was significantly overstated and that it would be lowered, and the Company reported that it would be forced to take a charge of $15.7 million from its goodwill.

13. Thereafter, on July 23, 2009, the Company's market capitalization declined by $826 million, to a price 63% lower than its September 18, 2008 high following the Split-Off.

14. Defendants' improper conduct has caused and will continue to cause damage to Celera and its public shareholders, including increased loss of its reputation and goodwill, and the costs associated with the numerous shareholder class action lawsuits filed against Celera and its senior officers as a result of their improper conduct.

---

[1] All emphasis is added unless otherwise stated herein.

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

**JURISDICTION AND VENUE**

15.     This shareholder derivative action is brought pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

16.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. §1332, because plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.  Celera is headquartered in the United States District Court, Northern District of California (the "Northern District"), with its principal executive offices at 1401 Harbor Bay Parkway, Alameda, California.  The Company and the Defendants are subject to personal jurisdiction in the Northern District.

18.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Celera maintains its principal place of business in the Northern District; (ii) one or more of the Defendants either resides in or maintains executive offices in the Northern District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in the Northern District; and (iv) defendants have received substantial compensation in the Northern District by doing business here and engaging in numerous activities that had effect in the Northern District.

**INTRADISTRICT ASSIGNMENT**

19.     A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the county of Alameda, in the Northern District of California. This action has been designated "related" to the securities class action currently pending in the Northern District, San Jose division.  As such, this action is properly assigned to the San Jose division of this Court.

**THE PARTIES**

20.     Plaintiff Alan R. Kahn, a citizen of New York, is and was at all times relevant hereto, a long-time owner and holder of Celera common stock.  Plaintiff Kahn has been a

- 4 -

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

1  shareholder continuously since Celera's shares traded as a tracking stock when it was a wholly-

2  owned subsidiary of Applera, prior to the beginning of the Relevant Time Period on April 24,

3  2008.

4       21.    Plaintiff Betty Greenberg, a citizen of New York, is and was at all times

5  relevant hereto, an owner and holder of Celera common stock.  Plaintiff Greenberg has been a

6  shareholder continuously since September 3, 1999.

7       22.    Nominal Defendant Celera is a Delaware corporation with its principal

8  executive offices at 1401 Harbor Bay Parkway, Alameda, California.  Celera is named in this

9  complaint as a nominal defendant solely in a derivative capacity, and this shareholder

10 derivative action is brought by Plaintiffs on its behalf.  Celera is a healthcare business that

11 delivers personalized disease management through a combination of products and services.  It

12 operates in three segments:  (i) Lab Services; (ii) Products; and (iii) Corporate.  The Lab

13 Services segment offers clinical laboratory tests and disease management services for

14 healthcare providers.  The Products segment develops and manufactures molecular diagnostic

15 products for disease detection, prediction of disease predisposition, monitoring of disease

16 progression and disease severity, and determination of patient responsiveness to treatments.

17 The Corporate segment licenses small molecule drug development programs and intellectual

18 property to third parties for use in the diagnostic field.

19      23.    Defendant Ordonez, a citizen of California, is Chief Executive Officer of Celera

20 and has served as a director of Celera since February 2008.  From December 2000 to July

21 2008, Ordonez held various positions at Applera, including Senior Vice President, President of

22 Celera Group, and president of Celera Diagnostics, LLC, a wholly-owned subsidiary of

23 Applera.  Prior to joining Applera, Ordonez was employed by Hoffmann-La Roche, where she

24 was President and Chief Executive Officer of Roche Molecular Systems from 1991 to 2000.

25 Ordonez signed or authorized the signing of the false and misleading Registration Statement

26 identified herein.  Specifically, Ordonez:  (i) made improper statements regarding Celera's

27 allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings

28 guidance; (ii) made improper statements in the Company's March 25, 2009 Form 10-KT

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill, and internal controls; and (iii) reviewed and approved inadequate internal controls with respect to Celera's financial reporting.   Celera paid Ordonez the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2009 | $650,000 | $257,717 | $363,750 | $278,363 | $26,802 | $1,576,632 |
| 2008 | $347,712 | - | - | $338,254 | $3,004 | $688,970 |

24.    Defendant Jung, a citizen of California, was Celera's Chief Financial Officer ("CFO") from February 2008 until he resigned in April 2009.  From 2006 until July 2008, Jung was Applera's Vice President of Finance for the Celera Group and Assistant Controller.  Jung: (i) made improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; (ii) made improper statements in the Company's March 25, 2009 Form 10-KT regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill, and internal controls; and (iii) reviewed and approved inadequate internal controls with respect to Celera's financial reporting.  Celera paid Jung the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2009 | $82,115 | - | - | - | $336,931 | $419,046 |
| 2008 | $163,654 | - | - | $64,100 | $5,178 | $232,932 |

25.    Defendant DeBlasi, a citizen of California, has been Celera's Senior Vice President and CFO since April 2009.  DeBlasi was a consultant to the Company prior to commencing his role as CFO.  DeBlasi recently announced that he was leaving Celera, effective November 19, 2010.  From 2003 to 2008, DeBlasi served in various positions at Applera including Vice President and Controller, Vice President of Finance, Corporate Controller, Assistant Corporate Controller, Director of Financial Accounting and Reporting, and Senior Manager of Financial Reporting. DeBlasi:  (i) made improper statements regarding

Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; and (ii) reviewed and approved inadequate internal controls with respect to Celera's financial reporting.  Celera paid DeBlasi the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2009 | $317,403 | $92,775 | $478,400 | $80,663 | $92,027 | $1,061,268 |
| 2008 | - | - | - | - | - | - |

26.    Defendant Richard A. Ayers ("Ayers"), a citizen of Florida, has served as a director of Celera since February 2008.  Ayers has been the Chairman of Celera's Audit and Finance Committee since July 2008.  Ayers was also a director of Applera from 1988 until June 2008.  Ayers:  (i) reviewed and approved improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; and (ii) reviewed and approved inadequate internal controls with respect to Celera's financial reporting. Celera paid Ayers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2009 | $60,000 | $75,200 | $135,200 |
| 2008 | $30,000 | $30,125 | $60,125 |

In addition, while in possession of material, non-public information concerning Celera's true business health during the Relevant Time Period, defendant Ayers sold 10,339 shares of his stock, approximately 25% of his holdings, for $119,579 in proceeds.  Ayers' sale during the Relevant Time Period is his only stock sale to date.

27.    Defendant Jean-Luc Belingard ("Belingard"), a citizen of France, has served as a director of Celera since February 2008.  Belingard was a director of Applera from 1993 until June 2008.  From 1990 to 1998, Belingard was Director General of the Diagnostics Division and a member of the Executive Committee of Hoffman-La Roche.  Belingard is currently Chairman and Chief Executive Officer of Ipsen S.A., a diversified French healthcare holding

company, and has served in that position since January 2002.  Belingard:  (i) failed to correct improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; (ii) made improper statements in the Company's March 25, 2009 Form 10-KT regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill, and internal controls; and (iii) failed to maintain adequate internal controls with respect to Celera's financial reporting.  Celera paid Belingard the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2009 | $55,000 | $75,200 | $130,200 |
| 2008 | $27,500 | $30,125 | $57,625 |

In addition, while in possession of material non-public information concerning Celera's true business health during the Relevant Time Period, defendant Belingard sold 21,428 shares of his stock, approximately 1/3 of his holdings, for approximately $247,832 in proceeds. Belingard's sale during the Relevant Time Period is his only stock sale to date.

28.    Defendant William G. Green ("Green"), a citizen of California, is Celera's Chairman of the Board of Directors and has served as a director of Celera since July 2008. Green was also a member of Celera's Audit and Finance Committee from July 2008 to at least April 2009.   Green: (i) reviewed and approved improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; (ii) made improper statements in the Company's March 25, 2009 Form 10-KT regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill, and internal controls; and (iii) reviewed and approved inadequate internal controls with respect to Celera's financial reporting.   Celera paid Green the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2009 | $90,000 | $75,200 | $165,200 |
| 2008 | $45,000 | $23,940 | $68,940 |

- 8 -

29.     Defendant Peter Barton Hutt ("Hutt"), a citizen of Virginia, has served as a director of Celera since August 2008.  Hutt is also a director of ISTA Pharmaceuticals, Inc. and Momenta Pharmaceuticals.   Additionally, within the last five years, he was a director of Favrille, Inc.  Hutt:  (i) failed to correct improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; (ii) made improper statements in the Company's March 25, 2009 10-KT regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill and internal controls; and (iii) failed to maintain adequate internal controls with respect to Celera's financial reporting.  Celera paid Hutt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2009 | $45,000 | $75,200 | $120,200 |
| 2008 | $22,500 | $23,940 | $46,440 |

30.     Gail K. Naughton ("Naughton"), a citizen of California, has served as a director of Celera and a member of Celera's Audit and Finance Committee since July 2008.  Naughton: (i) reviewed and approved improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; (ii) made improper statements in the Company's March 25, 2009 Form 10-KT regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill, and internal controls; and (iii) reviewed and approved inadequate internal controls with respect to Celera's financial reporting.  Celera paid Naughton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2009 | $55,000 | $75,200 | $130,200 |
| 2008 | $27,500 | $23,940 | $51,440 |

31.     Defendant Wayne I. Roe ("Roe"), a citizen of Maryland, has served as a director of Celera since December 2008.  Roe has also served as a member of Celera's Audit and Finance Committee since at least April 2009.  Roe currently sits on the board of directors of

ISTA Pharmaceuticals, Inc..  Additionally, within the last five years, he was a director of Favrille, Inc..  Roe:  (i) reviewed and approved improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; (ii) made improper statements in the Company's March 25, 2009 Form 10-KT regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill, and internal controls; and (iii) reviewed and approved inadequate internal controls with respect to Celera's financial reporting.  Celera paid Roe the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2009 | $45,000 | $75,200 | $120,200 |
| 2008 | $3,263 | $3,068 | $6,331 |

32.     Defendant Bennett M. Shapiro ("Shapiro"), a citizen of Pennsylvania, has served as a director of Celera since May 2008.  He is also a director of Momenta Pharmaceuticals, Inc.  Shapiro:  (i) failed to correct improper statements regarding Celera's allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance; (ii) made improper statements in the Company's March 25, 2009 Form 10-KT regarding the Company's ability to bring additional business under contract, accounts receivable, goodwill, and internal controls; and (iii) failed to maintain adequate internal controls with respect to Celera's financial reporting.  Celera paid Shapiro the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2009 | $45,000 | $75,200 | $120,200 |
| 2008 | $22,500 | $23,940 | $46,440 |

33.     Each of the Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Celera's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors; *i.e.*, the market.  They were provided with copies of the Company's reports and press releases

1   alleged herein to be misleading prior to or shortly after their issuance, and had the ability and

2   opportunity to prevent their issuance or cause them to be corrected.  Because of their positions

3   with the Company, and their access to material non-public information available to them but

4   not available to the public, Defendants knew that the true financial condition of the Company,

5   as specified herein, had not been disclosed to, and was being concealed from, the public, and

6   that the positive representations Defendants made regarding Celera's financial well-being were

7   then materially false and misleading.  Defendants are liable for the consequences of this

8   conduct, as specified herein.

9   <u>**DEFENDANTS' DUTIES AS DIRECTORS AND OFFICERS OF CELERA**</u>

10          34.     By reason of their positions as officers and/or directors and fiduciaries of

11  Celera, and because of their ability to control the business and corporate affairs of Celera,

12  Defendants owed Celera and its shareholders fiduciary obligations of trust, loyalty, good faith

13  and due care, and were and are required to use their utmost ability to control and manage

14  Celera in a fair, just, honest and equitable manner.  Defendants were and are required to act in

15  furtherance of the best interests of Celera and its shareholders so as to benefit all shareholders

16  equally and not in furtherance of their personal interest or benefit.

17          35.     Each of the Defendants owes Celera and its shareholders the fiduciary duty to

18  exercise good faith and diligence in the administration of the affairs of the Company, in the use

19  and preservation of its property and assets, and to uphold the highest obligations of fair

20  dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a

21  duty to promptly disseminate accurate and truthful information with regard to the Company's

22  management and operations so that the market price of the Company's stock would be

23  accurate.

24          36.     During the Relevant Time Period, Defendants, as senior executive officers

25  and/or directors of Celera, were privy to confidential and proprietary information concerning

26  the Company, its operations, finances, financial condition, and present and future business

27  prospects via access to internal corporate documents, conversations and connections with other

28  corporate officers and directors, attendance at management and/or Board meetings and

- 11 -

1  committees thereof.   The Defendants also had access to material, adverse, non-public

2  information concerning Celera.  Because of their possession of such information, Defendants

3  knew or recklessly disregarded that the adverse facts specified herein had not been disclosed

4  to, and were in fact being concealed from, the investing public.

5       37.    At all times relevant hereto, each of the Defendants was the agent of each of the

6  other Defendants and of Celera, and was at all times acting within the course and scope of such

7  agency.

8       38.    To discharge their duties, the Defendants were required to exercise reasonable

9  and prudent supervision over the management, policies, practices and controls of the financial

10  affairs of the Company.  By virtue of such duties, the Defendants were required to, among

11  other things:

12       a.    Ensure that the Company complied with its legal obligations and

13  requirements, including acting only within the scope of its legal authority and disseminating

14  truthful and accurate statements to the SEC and the investing public;

15       b.    Remain informed as to how Celera conducted its operations and, upon

16  receipt of notice or information of imprudent or illegal conditions or practices, to make

17  reasonable inquiry in connection therewith, and to take steps to correct such conditions or

18  practices and make such disclosures as necessary to comply with federal and state securities

19  laws; and

20       c.    Ensure that the Company was operated in a diligent, honest and prudent

21  manner in compliance with all applicable federal, state and local laws, rules and regulations.

22       39.    Each Defendant, by virtue of his or her position as a director and/or officer,

23  owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the

24  exercise of due care and diligence in the management and administration of the affairs of the

25  Company, as well as in the use and preservation of its property and assets.  The conduct of the

26  Defendants complained of herein involves a knowing and culpable violation of their

27  obligations as directors and officers of Celera, the absence of good faith on their part, and a

28  reckless disregard for their duties to the Company.

**Audit Committee Duties**

40.     In addition to these duties, under the Company's Audit and Finance Committee's Charter, defendants Ayers, Green, Naughton, and Roe owed specific duties to Celera to review the Company's earnings press releases, guidance, quarterly and annual financial statements, and internal controls.  The Audit and Finance Committee met at least eight times during 2008 and twelve times during 2009.  In relevant part, the Audit and Finance Committee's Charter states:

**I. Purpose**

The purposes of the Audit and Finance Committee (the "Committee") are to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and to make recommendations to the Board about the financial policies of the Company and the nature and structure of major strategic financial commitments.

* * *

(ii)    The Committee shall review and discuss with management and the independent auditor: (A) *major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies*; (B) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the Company's financial statements.

* * *

6. *Recommendation to Include Financial Statements in Annual Report*. The Committee shall, based on the review and discussions in paragraphs 4(iii) and 5(iii) above, and based on the disclosures received from the independent auditor regarding its independence and discussions with the auditor regarding such independence pursuant to subparagraph 3(ii) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

*Quarterly Financial Statements*

7. *Meetings with Management, the Independent Auditor and the Internal Auditor.* The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

\* \* \*

14. The Committee shall have the authority to review, and where appropriate, make recommendations to the Board regarding the financial aspects of risk management policies and their impact on the Company, including but not limited to interest rates, insurance and foreign exchange.

\* \* \*

*Other Powers and Responsibilities*

17. **The Committee shall discuss with management and the independent auditor the Company's earnings press releases** (with particular focus on any "pro forma" or "adjusted" non- GAAP information), **as well as financial information and earnings guidance provided to analysts and rating agencies**.

\* \* \*

19. The Committee shall discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

\* \* \*

25. The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board. In connection with the Committee's responsibility for the oversight of the Company's compliance with legal and regulatory requirements, the Company's Nominating and Corporate Governance Committee shall be primarily responsible for oversight of the Company's compliance with legal and regulatory requirements other than securities and accounting laws and regulations.

**Control, Access, and Authority**

41.     The Defendants, because of their positions of control and authority as directors and/or officers of Celera, were able to and did, directly and/or indirectly, exercise control over

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT     CASE NO. CV 10-02935 JW

1  the wrongful acts complained of herein, as well as the contents of the various public statements

2  issued by the Company.

3        42.    Because of their advisory, executive, managerial, and directorial positions with

4  Celera, each of the Defendants had access to adverse, non-public information about the

5  financial condition, operations, and growth prospects of Celera.  While in possession of this

6  material, non-public information, the Defendants made improper representations regarding the

7  Company, including information regarding Celera's financial results and business prospects.

8  **<u>Reasonable and Prudent Supervision</u>**

9        43.    To discharge their duties, the officers and directors of Celera were required to

10  exercise reasonable and prudent supervision over the management, policies, practices, and

11  controls of the financial affairs of the Company.  By virtue of such duties, the officers and

12  directors of Celera were required to, among other things:

13          (a)    properly and accurately guide investors and analysts to the true financial

14  condition of the Company at any given time, including making accurate statements about the

15  Company's financial health;

16          (b)    ensure that the Company complied with its legal obligations and

17  requirements, including acting only within the scope of its legal authority and disseminating

18  truthful and accurate statements to the investing public;

19          (c)    conduct the affairs of the Company in an efficient, business-like manner

20  to make it possible to provide the highest quality performance of its business, to avoid wasting

21  the Company's assets, and to maximize the value of the Company's stock;

22          (d)    remain informed how Celera conducted its operations, and, upon receipt

23  of notice or information of imprudent or unsound conditions or practices, make reasonable

24  inquiry in connection therewith, and take steps to correct such conditions or practices and make

25  such disclosures as necessary to comply with securities laws; and

26          (e)    ensure that the Company was operated in a diligent, honest, and prudent

27  manner in compliance with all applicable laws, rules, and regulations.

28

**Breaches of Duties**

44.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Celera, the absence of good faith on their part, and a knowing or willful disregard for their duties to the Company and its shareholders that the Defendants were aware posed a risk of serious injury to the Company.

45.     Defendants breached their duty of loyalty by causing or allowing others to cause the Company to misrepresent its financial condition and results.  In particular, the Defendants made improper statements concerning the Company's accounts receivables, bad debt, and goodwill.  Each of the Defendants also failed to prevent the other Defendants from taking such illegal actions.  Because of the Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws.  Celera has also experienced a substantial loss in stock price and will incur significant costs in investigating and defending the Company and the Defendants.  Thus, Celera has expended, and continues to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

46.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.     During all times relevant hereto, Defendants collectively and individually initiated a course of conduct that was designed to and did:  (i) conceal the fact that Defendants were improperly misrepresenting the Company's accounts receivables, bad debt, goodwill, and business prospects; (ii) enhance Defendants' executive and directorial positions at Celera and

the profits that Defendants enjoyed as a result of holding these positions; (iii) deceive the investing public, including shareholders of Celera, regarding Defendants' management of Celera's operations, Celera's financial health and stability, and its future business prospects. In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

48.     Defendants engaged in a conspiracy, common enterprise and/or common course of conduct that caused the Company to issue false financial statements that concealed the true fact that the Company's Lab Services business was actually decreasing, and that the Company had failed to properly account for its bad debt.

49.     The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to conceal adverse information concerning the Company's operations, financial condition, and future business prospects, and to disguise Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment.

50.     Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully or recklessly issue false financial statements that misrepresented the Company's business operations and financial results. Because the actions described herein occurred under the authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS' BREACHED THEIR FIDUCIARY DUTIES BY ISSUING FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT TIME PERIOD

52. Throughout the Relevant Time Period, Defendants breached their fiduciary duties by causing the Company to issue false and misleading statements which materially misled the investing public.

53. On April 24, 2008, Celera issued a press release entitled "Celera Reports Third Quarter Fiscal 2008 Results," stating that the Company was "continu[ing] to grow" as it embarked on the Split-Off, and included statements by Ordonez touting BHL's purported contributions to the Company's financial results. The press release stated in part:

> Celera, an Applera Corporation business, today reported net revenues of $39.5 million for the third quarter of fiscal 2008, compared to $9.8 million in the prior year quarter. The third quarter fiscal 2008 results included net revenues from Berkeley HeartLab, Inc. (BHL) and Atria Genetics, Inc., which were acquired during the second quarter of fiscal 2008. Excluding revenues from these acquisitions, Celera's net revenues in the third quarter of fiscal 2008 were $14.7 million.

> For the third quarter of fiscal 2008, Celera reported a net loss of $7.4 million, or $0.09 per share, compared to a net loss of $14.5 million, or $0.06 per share, for the prior year quarter. Results for both periods were affected by the specified items described in the reconciliation below. Third quarter fiscal 2008 loss per share on a non-GAAP basis, excluding the specified items described below, was $0.01, compared to a loss of $0.06 per share for the prior year quarter. All per share amounts refer to Applera Corporation-Celera Group Common Stock.

> "*Celera's business continues to grow as it prepares for its anticipated separation from Applera*," said Tony L. White, Chairman, President and Chief Executive Officer of Applera Corporation. "As planned, we filed a registration statement with the Securities and Exchange Commission and are continuing to target completion of the separation process by the end of June."

> "*We're pleased with the contributions Berkeley HeartLab and Atria Genetics are making to Celera's performance,*" said Kathy Ordonez, President of Celera. "We are now test marketing our new *KIF6* genetic assay at Berkeley HeartLab that identifies people with elevated genetic risk for coronary heart disease that is ameliorated by statin therapy, and are very impressed with the initial adoption of the test among a select group of physicians and patients."

> *    *    *

> • Revenues by category for the third quarter of fiscal 2008 compared to the prior year quarter were: $9.1 million for Product sales compared to $6.3 million in the prior year quarter, primarily due to sales of Atria HLA products and a slightly higher equalization payment from Abbott; Royalty, Licenses and Milestone revenue was $7.8 million compared to $3.5 million in the prior quarter, primarily due to higher licensing and

royalty revenues; and revenues from Services were $22.6 million in the third quarter of fiscal 2008.  As noted above, BHL was acquired in the second quarter of fiscal 2008.

- …SG&A expenses for the third quarter of fiscal 2008 increased to $21.3 million from $7.1 million in the prior year quarter, primarily due to expenditures relating to BHL service revenues.

54.    That same day in a Q3 2008 Earnings conference call, Ordonez reported that the Lab Services had revenue of $22.6 million, which amounted to more than half of the Company's revenue for the quarter.  Additionally, Ordonez reported that the Company had added field resources at BHL, including eighteen "4myheart" centers.  Because of these centers, Ordonez reported, the BHL division was seeing an uptake in sample volume.

55.    Chris Hall, the Company's Chief Marketing and Clinical Operations Officer, also confirmed that the economic downturn had not affected the Company for several reasons, one of which was minimal out-of-pocket expenses for patients.  Specifically, Hall stated:

> *The second piece of the business is that most of these patients pay minimal or very little out of pocket. Medicare is covering most of -- covering everything that we're doing if the patient is a secondary prevention patient. We're increasingly getting into network, and the PPO patients are paying sub-$100, because of the strong reimbursement across the board.*

Ordonez confirmed that the payor mix is 50% Medicare.  Clarifying, defendant Jung stated that:

> *50% of the volume is Medicare. Obviously, less than that percentagewise is Medicare. The remaining balance is a mixture of private pay. Mostly out-of-network private reimbursement from the large insurance companies.*

56.    Thereafter, on June 19, 2008, Celera filed with the SEC a Form S-1/A Registration Statement, which would be utilized for the Split-Off (the "Registration Statement").  The Registration Statement was signed by defendants Ordonez, Jung, Ayers, Belingard, and Shapiro.  The Registration Statement contained the Company's financial results for the third quarter of fiscal 2008.

57.    On July 1, 2008, Celera completed the Split-Off and separated from Applera.

58.    On July 23, 2008, Defendants caused the Company to issue a press release entitled, "Celera Corporation Reports Fourth Quarter and Fiscal 2008 Results."   The press release misled the public regarding the Company's net losses, and Ordonez again touted BHL's

- 19 -

revenue contributions, despite knowing that BHL was struggling to collect on its account receivables and that the Company's accounting for those receivables was in violation of GAAP. The press release stated in part:

> Celera today reported net revenues of $43.4 million for the fourth quarter of fiscal 2008, compared to $10.2 million in the prior year quarter. The fourth quarter fiscal 2008 results included net revenues from Berkeley HeartLab, Inc. (BHL) and Atria Genetics Inc., which were acquired during the second quarter of fiscal 2008. Excluding revenues from these acquisitions, Celera's net revenues for the fourth quarter of fiscal 2008 were $15.0 million.
>
> **For the fourth quarter of fiscal 2008, Celera reported a net loss of $96.8 million, or $1.21 per share,** compared to a net loss of $8.0 million, or $0.10 per share, for the prior year quarter. For the fourth quarters of fiscal 2008 and 2007, Celera recorded items that affected the comparability of results and a breakdown of these items is listed in the reconciliation table below. For the fourth quarter of fiscal 2008, these items increased the net loss by $96.3 million, which included a $91.2 million non-cash tax charge to establish a valuation allowance, or reserve, against Celera's deferred tax assets as a result of the split-off from Applera Corporation. The tax charge is further described in the Financial Highlights below. For the fourth quarter of fiscal 2007, items affecting comparability increased the net loss by $2.9 million. Fourth quarter fiscal 2008 loss per share on a non-GAAP basis, excluding the items listed in the reconciliation table below, was $0.01, compared to a loss of $0.07 per share for the prior year quarter. All per share amounts are pro forma based on Applera Corporation-Celera Group Common Stock.
>
> For fiscal 2008, Celera reported net revenues of $139.4 million compared to $43.4 million for the prior year. Fiscal 2008 results included net revenues from BHL and Atria Genetics; excluding revenues from these acquisitions, Celera's net revenues in fiscal 2008 were $62.5 million.
>
> **For fiscal 2008, Celera reported a net loss of $103.2 million, or $1.30 per share**, compared to a net loss of $20.6 million, or $0.26 per share, for fiscal 2007. For fiscal 2008 and 2007, Celera recorded items that affected the comparability of results and a breakdown of these items is listed in the reconciliation table below. For fiscal 2008, these items increased the net loss by $104.1 million, which included the $91.2 million non-cash tax charge. For fiscal 2007, items affecting comparability increased the net loss by $2.1 million. Fiscal 2008 earnings per share (EPS) on a non¬GAAP basis, excluding the noncash tax charge and other items described in the reconciliation table below, were $0.01, compared to a loss of $0.24 per share for the prior year.
>
> **"The quarter's operating performance was good, closing out a solid fiscal 2008 – a pivotal year for Celera," said Kathy Ordonez, Chief Executive Officer of Celera. "The business developed as planned, as we achieved our**

*annual financial goals for revenue and profitability on a non-GAAP basis.* This year, we also completed the separation from Applera according to schedule, acquired two important businesses, Berkeley HeartLab and Atria Genetics, and defined our path forward as an independent company.

*"We're pleased with the contributions to revenue from both our Berkeley HeartLab Service business and our Products business during the quarter," Ms. Ordonez added.* "The trial market for KIF6 testing at BHL has been successful and we're optimistic for the test's potential future contribution to Celera following its full scale launch this week."

**Financial Highlights**

\*       \*       \*

- Revenue by category for the fourth quarter of fiscal 2008 compared to the prior year quarter was: $9.0 million for Product sales compared to $6.1 million in the prior year quarter, primarily due to sales of Atria HLA products; Royalty, License and Milestone revenue was $8.3 million compared to $4.1 million in the prior year quarter, primarily due to higher licensing and royalty revenue from patent licenses; and revenue from Services was $26.1 million in the fourth quarter of fiscal 2008. As noted above, revenue from Services consists primarily of sales by BHL, which was acquired in the second quarter of fiscal 2008.

**Outlook for the Remaining Six Months of Calendar 2008**

Celera's Board of Directors intends to align the company's fiscal year with the calendar year. As part of this process, Celera is issuing its outlook for the remaining six months of calendar 2008.

Subject to the inherent risks and uncertainties that may affect Celera's financial performance, which are detailed in the Forward-Looking Statements section of this release, Celera has the following expectations regarding its financial performance for the remaining six months of calendar 2008:

- Total reported revenues are anticipated to be $88 - $93 million.

- Reported R&D expenses are anticipated to be $18 - $21 million, and SG&A expenses are anticipated to be $45 - $50 million.

- Celera anticipates low single digit EPS on a non-GAAP basis for the second half of calendar 2008, although non-GAAP earnings for the period ending September 27, 2008, may be near break-even.

59.     That same day, Defendants held an earnings conference call. During that call, Defendants were questioned about reimbursement and booking revenue for certain preliminary tests that were in the market trial stage. Defendants were specifically questioned about the accounting treatment for marketing trials. Jung confirmed that the Company did receive

1    reimbursement for some of the tests, although there was a lag between when the test was

2    performed and when the Company was reimbursed.  Defendants were also questioned about

3    the retail difference between tests, which was approximately $400-500, and the reimbursement

4    of $100 for tests.  Ordonez stated that the Company was not trying to collect the difference

5    from patients, but that "[the Company] do[es not] really look at it as writing it off."

6           60.     Several months later, on October 28, 2008, Defendants caused the Company to

7    issue a press release entitled "Celera Corporation Reports Third Quarter Calendar 2008

8    Results."  The press release again misled the public regarding the Company's net losses, and

9    Ordonez again touted BHL's revenue contributions, despite knowing that BHL was struggling

10   to collect on its account receivables and that the Company's accounting for those receivables

11   was in violation of GAAP.  The press release stated in part:

> Celera today reported net revenues of $45.8 million for the third quarter of
> calendar 2008 that ended September 27, 2008, compared to $16.1 million in the
> prior year quarter.  The third quarter calendar 2008 results included net
> revenues from Berkeley HeartLab, Inc. (BHL) and Atria Genetics Inc., which
> were acquired during the fourth quarter of calendar 2007.  Excluding revenues
> from these acquisitions, Celera's net revenues for the third quarter of calendar
> 2008 were $12.9 million.
>
> ***For the third quarter of calendar 2008, Celera reported a net loss
> of $7.0 million, or $0.09 per share***, compared to net income of $0.7 million, or
> $0.01 per share, for the prior year quarter.  Celera recorded items in the third
> quarter of calendar 2008 that affected the comparability of results.   A
> breakdown of these items is listed in the reconciliation table below.  These
> items increased the net loss for the quarter by $7.5 million.  Net income on a
> non-GAAP basis, excluding the items listed in the reconciliation table below,
> was $0.01 per share for the third quarter of calendar 2008 and for the prior year
> quarter.
>
> ***"We're pleased with the growth of both our Lab Services and our
> Products business segments during the quarter," said Kathy Ordonez, Chief
> Executive Officer of Celera.***  "We're also encouraged with the response from
> physicians who used the recently commercialized KIF6 blood testing service
> offered by BHL, and look forward to the launch of the testing service in a cheek
> swab format as part of our Direct-to-Physician strategy for growth."
>
> **Financial Highlights**
>
> *        *        *

Revenue by segment for the third quarter of calendar 2008 was as follows:

- Lab Services revenue was $30.1 million.  As noted above, Lab Services revenue consists of sales made by BHL, which was acquired in the fourth quarter of calendar 2007.

- Products revenue was $10.5 million compared to $4.7 million in the prior year quarter, primarily due to sales of Atria HLA products and a higher equalization payment from Abbott.

- Corporate revenue was $5.2 million compared to $11.4 million in the prior year quarter.  The prior year quarter included revenue of $5.0 million derived from Celera's former small molecule business.  In the third quarter of calendar 2008, Celera did not recognize royalty revenue from Cepheid, one of Celera's licensees, because Celera changed from an accrual basis to a cash received basis for this license.  This was due to limitations in Celera's ability to estimate the quarterly royalty revenue prior to receipt of payment in the subsequent quarter. Celera will start to record this royalty revenue on a cash received basis in the fourth quarter of calendar 2008.  For the twelve months ended June 30, 2008, Celera recorded revenue of $11.6 million from the licensing arrangement with Cepheid.

. . . SG&A expenses for the third quarter of calendar 2008 increased to $25.2 million from $8.1 million in the prior year quarter, primarily due to the inclusion of BHL expenses.

*      *      *

**Outlook for the Second Half of Calendar 2008**

Celera's Board of Directors approved the alignment of the company's fiscal year with the calendar year, and as part of this process, Celera issued its outlook for the second half of calendar 2008 when it reported its fiscal 2008 results that ended June 30, 2008.

Subject to the inherent risks and uncertainties that may affect Celera's financial performance, which are detailed in the Forward-Looking Statements section of this release, Celera has the following expectations regarding its financial performance for the second half of calendar 2008 that ends December 27, 2008:

1.      Total reported revenues are anticipated to be $89 - $93 million, which now excludes one quarter of royalty revenue from Cepheid as described above.

2.      Reported R&D expenses are anticipated to be $16 - $19 million, and SG&A expenses are anticipated to be $48 - $52 million.

3.      Celera anticipates EPS of $0.01 - $0.02 on a non-GAAP basis.

*      *      *

5        The total pre-tax impact of FAS 123R is expected to be approximately $3 million.

61.      On February 17, 2009, the Company issued a press release entitled "Celera Corporation Reports Fourth Quarter Calendar 2008 Results," which improperly reported the Company's net losses; improperly reported BHL's bad debt expense; and provided improper guidance for the Company's 2009 fiscal year.  Defendants Ayers, Green, Naughton and Roe, as members of the Company's Audit and Finance Committee, reviewed and approved this guidance.  Specifically, among other things, Defendants wrongly caused the Company to falsely inflate its revenue guidance by claiming, among other things, that an "increasing portion of [BHL's] business will be under contract with third-party insurance payors."  The press release stated in part:

> Celera today reported net revenues of $47.3 million for the fourth quarter of calendar 2008 that ended December 27, 2008, compared to $40.3 million in the prior year quarter.  For the fourth quarter of calendar 2008, Celera reported a net loss of $6.1 million, or $0.08 per share, compared to net income of $0.3 million, or $0.00 per share, for the prior year quarter.  Results for both periods included items that affected the comparability of results. A breakdown of these items is listed in the reconciliation table below.  These items increased the net loss for the fourth quarter of calendar 2008 by $8.2 million.  Net income on a non-GAAP basis, excluding the items listed in the reconciliation table below, was $2.1 million, or $0.03 per share, for the fourth quarter of calendar 2008 compared to $1.7 million, or $0.02 per share, for the prior year quarter.

> In July, 2008, and as previously announced, Celera changed its fiscal year to align with the calendar year.  When the Company reported its fiscal 2008 earnings for the year ended June 30, 2008, it provided a business outlook for the six months ended December 27, 2008, which is referred to here as the transition period.  For the transition period, Celera reported net revenues of $93.1 million compared to $56.5 million for the prior year.  Results for the prior year six-month period included revenues from Berkeley HeartLab, Inc., (BHL) and Atria Genetics, Inc., from the dates of their acquisition at the beginning of the fourth quarter of calendar 2007.

> **_For the transition period, Celera reported a net loss of $13.1 million, or $0.16 per share,_** compared to net income of $1.0 million, or $0.01 per share, for the comparable period in the prior year.  Results for both periods included items that affected the comparability of results. A breakdown of these items is listed in the reconciliation table below.  These items increased the net loss for the transition period by $15.7 million.  Net income on a non-GAAP basis, excluding the items listed in the reconciliation table below, was $2.6 million, or

$0.03 per share, for the transition period, compared to $2.4 million, or $0.03 per share, for the prior year period.

"The strong performance in the fourth quarter allowed us to exceed the goals that we laid out for the six-month transition period following our separation from Applera Corporation," said Kathy Ordonez, Chief Executive Officer of Celera.  "Berkeley HeartLab is now initiating the marketing of StatinCheck, a cheek swab testing service for KIF6, in a pilot study."

**Financial Highlights**

\*        \*        \*

Revenue by segment for the fourth quarter of calendar 2008 was as follows:

- Lab Services revenue was $29.2 million compared to $21.2 million in the prior year quarter, primarily due to increased test volumes processed by the laboratory and a contribution from KIF6 sales following the launch of the blood-based test service by BHL in July 2008;

- Products revenue was $11.2 million compared to $9.5 million in the prior year quarter.  The growth in revenues for the fourth quarter of calendar 2008 was primarily from sales of certain Celera manufactured products, and royalties from sales of RealTi*me*TM viral load assays used on the *m*2000TM system from Abbott; and

- Corporate revenue was $6.9 million compared to $9.6 million in the prior year quarter. The reduction in revenue in the fourth quarter of calendar 2008 was due primarily to lower royalty and service revenues.

*. . . SG&A expenses for the fourth quarter of calendar 2008 were $27.0 million compared to $20.1 million in the prior year quarter; $3.7 million of this increase was due to an increased allowance for bad debt at BHL.* Additional contributions to this increase in SG&A were from Corporate infrastructure build-out and transition activities related to Celera's separation from Applera Corporation (now Life Technologies, Inc.), and costs associated with the expansion of sales efforts at BHL.

\*        \*        \*

**Outlook for 2009**

Celera anticipates that its 2009 financial performance could be affected by various factors, including uncertainty in the global economy and its potential impact on the healthcare system.  Subject to the inherent risks and uncertainties that may affect Celera's financial performance, which are detailed in the Forward-Looking Statements section of this release, Celera expects the following for fiscal year 2009:

- 25 -

1.      ***Total revenues are anticipated to be \$192 - \$202 million and gross margin, as a percentage of revenue, is anticipated to be 66 -70 percent.***  The number of samples tested at BHL in 2009 is expected to grow by more than 20 percent over 2008 levels.

*This revenue guidance reflects BHL's expectation that an increasing portion of its business will be under contract with third-party insurance payors.  Celera believes that moving under contract with third-party payors should allow BHL to increase its test volumes and operate more efficiently with respect to billing and collections.  However, such contracts generally provide for reduced pricing for BHL's tests as compared to tests paid by non-contract payors.  Revenues from contract payors are based on the contract rate and, in the case of Medicare, the published fee schedules.  Revenues from non-contract payors are recorded net of allowances for differences between amounts billed and estimated receipts based on historical activity.*

2.      ***SG&A expenses are anticipated to be \$102- \$112 million*** and R&D expenses are anticipated to be \$30 - \$36 million.

\*          \*          \*

4.      Celera anticipates mid-single digit EPS on a non-GAAP basis for 2009, and expects to be slightly below breakeven on a non-GAAP basis in the first quarter.  Due to declining interest rates, interest income is expected to be lower than the prior year.

62.      After issuing its fourth quarter and full-year 2008 financial results, Celera hosted a conference call for analysts, media representatives and investors on February 17, 2009, during which Ordonez and Jung again falsely misrepresented the Company's actual expense increase, the Company's ability to collect on outstanding BHL account receivables, and the Company's efforts to improve BHL's collections:

[ORDONEZ:] During the recent quarter, Celera's ***SG&A expenses increased 34% over the prior year period***.  While some of this expense growth was due to the corporate infrastructure buildout as a result of our split-off from Applera and the expansion of our sales efforts at BHL, ***the single major driver was an increased allowance for bad debt at BHL.***  Currently approximately half of BHL's revenues are derived from testing reimbursed by Medicare, as well as private payers under contract.  ***We historically have received timely payments from these payers, making this portion of our business fairly predictable from a collections perspective***.

For the remaining half of BHL's revenues, we have exposure to changing an inconsistent payment pattern from non-contracted payers and patients.  We have experienced an increase in Celera's DSO as a consequence of an increased aging of the BHL non-contracted payer and patient receivables.

- 26 -

During the fourth quarter of 2008, our allowance for bad debt increased $3.7 million over the prior year period.  This increase included a discrete charge of approximately $1 million associated with a billing dispute with a contracted payer.  *We now have a concerted program to improve collections at BHL*. We have increased our internal efforts and have retained an experienced third-party vendor to assist us.

We also have a goal during 2009 to increase the percentage of testing under contract at BHL.  While we expect new contracts to result in price reductions and impact our revenue growth rate on a short-term basis, *we believe this is the best path forward as BHL continues to grow as it is expected to improve both the predictability of the business, as well as collections over the medium to long-term*.

\*       \*       \*

[JUNG] *Total revenues are anticipated to be between $192 million and $202 million, and gross margin as a percent of revenues is anticipated to be between 66% and 70%*. The number of samples tested at BHL in 2009 is expected to grow by more than 20% over 2008 levels. *This revenue guidance reflects our expectation that an increasing portion of BHL's business will be under contract with third-party insurance payers. Celera believes that moving under contract with third-party payers should allow BHL to increase its test volumes and operate more efficiently with respect to billing and collections*. However, such contracts generally provide for reduced pricing for BHL's tests as compared to tests paid by non-contract payers. Revenues from contract payers are based on the contract rates and in the case of Medicare the published fee schedules.   Revenues from non-contract payers are recorded net of allowances for differences between amounts billed and estimated receipts based on historical activity.  *SG&A expenses are anticipated to be between $102 million and $112 million*, and research and development expenses are anticipated to be between $30 million and $36 million.  Celera expects to take a pretax restructuring charge of approximately $1.8 million over the first three quarters of fiscal 2009 associated with the closure of its Rockville, Maryland facility.  Approximately $1.4 million of these charges are expected to be cash outlays.

\*       \*       \*

[ANALYST:] Kathy, can you just tell us what has prompted the review of the BHL contracting?  Is there something specific that has gone on that has prompted you to move in that direction? This seems like a rather new development.

[ORDONEZ:] Well, as I indicated previously, currently about 50% of the business is either under contract or involves payment for Medicare. And, as I also indicated, we have seen an increase in the allowance that we have been making for bad debt at BHL as a result of certain activities by some of the

private payers, and we think that as we look at the size and maturity of this business, that the right strategy for us going forward is to bring more of the business under contract.  We think it makes the collections more predictable and also is more consistent with the evolution of the size of the business.

*       *       *

[ANALYST:] I just wonder if I could talk about that bad debt.  Is that likely to continue in 2009?  If you can extend that or further expectation?

[ORDONEZ:] Well, as we indicated, about half of our business is either with Medicare or under contract, and for the private payer business that is not contracted or where patient copays, etc. are involved, there is always a certain amount of uncertainty about the collections with that.  And so we have a very strong, as I said, concerted effort here at Celera to focus on the receivables and to improve our ability to collect those receivables, but no one can predict what will happen.  These are somewhat unprecedented economic times, and while I indicated our very strong plan to move more of the private payer business under contract, that has not yet occurred, and it is something that we expect to do but have not yet achieved.  So I don't know if you have additional comments or color you want to add to that, but that –

[JUNG:] I think that really is the focus of things here clearly.  **The contracts will go a long ways towards helping to resolve some of those issues**.

[ORDONEZ:] **Also, as we indicated in the script, there was a discrete issue that contributed to the allowance for bad debt in the quarter that we are reporting about here that contributed about $1 million, and we would not hopefully expect that to be a recurring item**.

63.     On March 25, 2010, Ordonez, Jung, Belingard, Green, Hutt, Naughton, Roe and Shapiro all signed the Company's Form 10-KT that contained improper statements.  The Form 10-KT stated that the Company had goodwill of more than $116.3 million, which was improper due to the declining value of the Lab Services segment.  Moreover, Ordonez, Jung, Belingard, Green, Hutt, Naughton, Roe and Shapiro all stated in the form 10-KT that:

**We expect BHL to bring additional business under contract with third-party insurance payors in 2009.**

*       *       *

**We have an established process to estimate and review the collectability of our receivables**.  **Bad debt expense is recorded in SG&A expenses in order to maintain an appropriate level of allowance for doubtful accounts**.  Receivables are reserved based on specific identification and on their respective aging categories.  Our process for determining the appropriate level of the

- 28 -

allowance for doubtful accounts involves judgment, and considers the age of the underlying receivables, type of payor, historical and projected collection expense, current economic and business conditions, and other external factors that could affect the collectability of our receivables. The allowance for doubtful accounts is reviewed for adequacy, at a minimum, on a quarterly basis. ***An account is written-off against the allowance for doubtful accounts when reasonable collection efforts have been unsuccessful and it is probable the receivable will not be recovered***.

\*       \*       \*

Our management evaluated the effectiveness of our disclosure controls and procedures as of the end of the six month transition period ended December 27, 2008, the period covered by this report. Based on that evaluation, ***our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such a period, our disclosure controls and procedures were effective at the reasonable assurance level***.

64.     On April 6, 2009, Jung, the Company's Chief Financial Officer, resigned from the Company effective immediately.

65.     Significantly, pursuant to his so-called "resignation," and for no apparent reason, the Board amended defendant Jung's employment agreement with the Company, allowing him to collect a windfall, $328,750 lump sum payment as well as "transition support services for twelve months."

66.     Thereafter, defendant DeBlasi was appointed CFO.

67.     On May 6, 2009, the Company issued a press release entitled "Celera Corporation Reports First Quarter 2009 Results," which reiterated the Company's outlook for fiscal 2009 and stated, in part:

Celera Corporation today reported net revenues of $45.7 million for the first quarter of 2009 that ended March 28, 2009, compared to $39.5 million in the prior year quarter that ended March 31, 2008. ***For the first quarter of 2009, Celera reported a net loss of $1.4 million, or $0.02 per share,*** compared to a net loss of $7.4 million, or $0.09 per share, for the prior year quarter. Results for both periods included items that affected the comparability of results. A breakdown of these items is listed in the reconciliation table below. These items increased the net loss for the first quarter of 2009 by $2.0 million. Net income on a non-GAAP basis, excluding the items listed in the reconciliation table below, was $0.6 million, or $0.01 per share, for the first quarter of 2009, compared to a net loss of $0.9 million, or $0.01 per share, for the prior year quarter.

*"We're pleased with the overall financial performance of the business during the first quarter," said Kathy Ordonez, Chief Executive Officer of Celera.* "We've also recently made progress in advancing our internal discoveries, and acquired access to externally derived technology, which we expect to move to market in the coming year as we further our commitment to be a leading provider of genetic tests used routinely in personalizing disease management."

**Financial Highlight**

- Revenue by segment for the first quarter of 2009 was as follows:

Lab Services revenue was $28.5 million compared to $22.3 million in the prior year quarter, primarily due to increased test volumes and the broad scale launch of the blood-based KIF6 test in July 2008;

Products revenue was $10.4 million compared to $9.3 million in the prior year quarter. Revenue for the first quarter of 2009 was primarily from sales of Celera-manufactured products and royalties from sales of RealTimeTM assays used on the m2000TM system from Abbott; and

Corporate revenue was $6.8 million compared to $7.9 million in the prior year quarter. The reduction in revenue in the first quarter of 2009 was due to the completion of payments by a licensee in addition to reduced royalty revenue received from another licensee, both of which were partially offset by $2.3 million from two new real-time licenses.

- *SG&A expenses for the first quarter of 2009 were $25.3 million, or 55.4% of revenues, compared to $21.3 million, or 53.9% of revenues, in the prior year quarter*. Of the increase in SG&A in the first quarter of 2009, $1.7 million was primarily due to costs associated with the expansion of sales efforts, *and $2.3 million was due to increased allowance for doubtful accounts.  Excluding the allowance for doubtful accounts, SG&A expenses for the first quarter of 2009 were $20.2 million, or 44.2% of revenues, compared to $18.5 million, or 46.8% of revenues in the prior year quarter*.

- *In the first quarter of 2009, allowance for doubtful accounts was $5.1 million, or 11.2% of revenues, and days sales outstanding were 98. This compares with allowance for doubtful accounts of $5.9 million, or 12.5% of revenues, and DSO of 92 in the fourth quarter of 2008, which included a $1.0 million charge for a billing dispute with a contractual payor*.

\*       \*       \*

**Outlook for 2009**

Celera anticipates that its 2009 financial performance could be affected by various factors, including uncertainty in the global economy and its potential impact on the healthcare system.  Subject to the inherent risks and uncertainties

- 30 -

that may affect Celera's financial performance, which are detailed in the Forward-Looking Statements section of this release, Celera expects the following for 2009:

- Total revenues are anticipated to be $192 - $202 million and gross margin, as a percentage of revenue, is anticipated to be 66 - 70%.

- **SG&A expenses are anticipated to be $102 - $112 million** and R&D expenses are anticipated to be $30 - $36 million.

\*          \*          \*

- Celera anticipates mid-single digit EPS on a non-GAAP basis for 2009, and expects to be at, or slightly below, breakeven on a non-GAAP basis in the second quarter.  Due to declining interest rates, interest income is expected to be lower than the prior year.

68.    Also on May 6, 2009, after issuing its first quarter 2009 financial results, Ordonez and DeBlasi hosted a conference call for analysts, media representatives and investors, during which defendants made the following improper statements, including DeBlasi's statement that the Company was "aggressively implementing measures" to deal with the Company's bad debt:

[ORDONEZ] *Another of our highest priorities is to reduce our allowance for doubtful accounts and DSO by improving our collections and moving more of our current payers under contract.  Ugo will provide more color on our collections efforts in a few minutes, but I would like to emphasize that this is a key focus for the Company as we have increased our internal efforts around improving collections, retained an experienced third-party vendor to assist us, and hired key people with experience in healthcare reimbursement and collections*.

In the first quarter of 2009, we entered into a preferred medical laboratory service agreement with Blue Cross and Blue Shield of Alabama for BHL's test services.  The agreement establishes coverage across Blue Cross and Blue Shield's commercial health plans in the state of Alabama.  With this new agreement, we estimate that approximately 55% of BHL's sample volume is now either derived from Medicare or from contracted private payer patients.

As we have indicated previously, while we expect new contracts to result in price reductions and impact our revenue growth rate on a short-term basis, we believe that this is the best path forward for us as it is expected to improve both the predictability of the business, as well as collections and profitability over the medium to long term.

\*          \*          \*

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

[DeBLASI:] *SG&A expenses for the first quarter of 2009 were $25.3 million or 55.4% of revenues compared to $21.3 million or 53.9% of revenues in the prior year quarter.  The increase in SG&A was due to a $2.3 million increase in the allowance for doubtful accounts* and a $1.7 million increase, primarily associated with the expansion of sales efforts.  Excluding the allowance for doubtful accounts, SG&A expenses for the first quarter of 2009 were $20.2 million or 44.2% of revenues compared to $18.5 million or 46.8% of revenues in the prior year quarter.  The allowance for doubtful accounts in the first quarter of 2009 was $5.1 million or 11.2% of revenues, and days sales outstanding were 98.  This compares with the fourth quarter of 2008 where the allowance for doubtful accounts was $5.9 million or 12.5% of revenues and DSO were 92.  The fourth quarter of 2008 included a $1.0 million charge for a billing dispute with a contractual payer.

*We have identified factors contributing to the increased DSO and are aggressively implementing measures to address these issues* as we monitor their effectiveness over the coming months.  *The anticipated move to contract with additional out of network payers is expected to positively improve efficiencies in this area.  We also plan to replace or improve legacy systems and processes that support the billing and collections function*.

[ANALYST:] I wonder if you could talk through what you have learned about the bad debt since last quarter and the plans that are in place to rectify it.

*          *          *

[DeBLASI:] *As I mentioned in my script, we have identified the factors contributing to the DSO, and we are aggressively implementing several measures to address these*.  Some key issues that we are addressing are late payments from Medicare, one private insurer's payment practices, discernible growth increase on the legacy billing and collection systems.  We are looking at a variety of process improvement.  We are realigning our resources with the current payment practices that we are seeing.  There's additional documentation requests that have come from many of our payers. So there's a host of issues and measures that we have in place to address them, and we are going to continue to measure their effectiveness on our accounts.

*          *          *

[ANALYST:] Okay. And I guess you've said initially that about 55% of your BHL stream is covered by Medicare or contracts.

[ORDONEZ:] Yes. I think what we said is about 55% of the samples that we process are either with Medicare or under contract.

[ANALYST:] Okay. And I guess how do you - what is a target number that you have by the end of the year?  Or if you want to push it out, what - I mean it's never going to go to 100% - but what do you think is a reasonable number that you can get that up to by the end of the year?

- 32 -

[ORDONEZ:] I'm not sure we can really answer that question at this point in time. *As we have said, we think that we should increase the percentage of our business under contract, and we are pleased to have made good progress with that in the prior quarter*. We have brought on additional resources to help us with that effort going forward, but we don't have a specific target percentage in mind. In some cases, it is actually advantageous for us in this situation to continue to collect from private payers on an out of network basis where they are paying well for the services and we're not having problems with collections. So it really is an individual decision with each of the insurers that needs to be made, and as Ugo gets more experience with the group here and has more time to delve into it, we are likely to be providing more color on that as we make progress in solving this issue.

## THE TRUTH EMERGES

### The Corrective Disclosures

69.   Less than three months later, on July 22, 2009, the Company issued a press release entitled, "Celera Announces Preliminary Second Quarter 2009 Revenue Results." The press release disclosed the true extent to which the Lab Services segment's inability to collect its account receivables and its resulting bad debt had significantly impacted the Company's financial well-being. As a result, Celera withdrew its 2009 guidance. The press release stated in part:

Celera Corporation today reported preliminary revenue results for the quarter ended June 27, 2009. The Company announced that it expects to report revenue for the second quarter of 2009 in the range of $40 million to $42 million. The Company reported revenue of $42.8 million in the second quarter of 2008.

Second quarter 2009 revenues relative to the prior year quarter are expected to show a reduction for the Company's Lab Services business, conducted by Berkeley HeartLab (BHL), mid-single digit percentage growth for the Products business, and a decline in licensing revenue in the Corporate segment.

*Lab Services revenues were adversely affected by* lower than anticipated sample volume due to broad economic pressures, *lost business as a result of the Company's efforts to collect aged receivables, and the denial of reimbursement on a number of legacy BHL tests by certain payors in some regions.* Overall, reimbursement rates, reflecting the impact of denied tests and historical collection activities, declined from both the second quarter of 2008 and the first quarter of 2009. The reduction in Corporate segment revenue in the second quarter of 2009 compared to the prior year period was due to the

completion of payments by one licensee, which was anticipated, as well as reduced royalty revenue received from another licensee.

\*       \*       \*

*Celera expects to record significant charges in the second quarter of 2009 for bad debt expense and impairment of goodwill and intangible assets. Celera expects to have 2009 revenues significantly below its present guidance for the year and hereby withdraws its 2009 guidance.* Celera expects to discuss its outlook for 2009 when it reports its second quarter 2009 results on August 6, 2009.

70.     Thereafter, on August 6, 2009, the Company issued its second quarter 2009 results, which confirmed the extent to which the Company's bad debt expense had actually been impacting Celera's earnings and expenses, contrary to Defendants' prior misrepresentations.  The press release stated in part:

**Financial Highlights**

\*       \*       \*

- Revenue by segment for the second quarter of 2009 was as follows:

  - Lab Services revenue was $25.2 million compared to $25.8 million in the prior year quarter, primarily as a result of lower reimbursement rates.  Overall, reimbursement rates, reflecting the impact of denied tests and historical collection activities, declined from both the second quarter of 2008 and the first quarter of 2009. Sample volume grew marginally year over year and was negatively impacted by broad economic pressures and lost business as a result of the Company's efforts to collect aged receivables;

  - Products revenue was $9.7 million compared to $9.1 million in the prior year quarter.  Revenue for the second quarter of 2009 was primarily from sales of Celera-manufactured products and royalties from sales of RealT*ime*TM assays used on the *m*2000TM system from Abbott; and

  - Corporate revenue was $6.5 million compared to $7.8 million in the prior year quarter.  The reduction in revenue in the second quarter of 2009 was primarily due to lower royalty revenue received from a licensee, which was anticipated, and that partially offset by higher licensing revenue.

- *SG&A expenses for the second quarter of 2009 were $41.1 million compared to $25.2 million in the prior year quarter.  Allowance for doubtful accounts in the second quarter of 2009 was $20.1 million compared to $4.3 million in the prior year quarter.  This increase was primarily due to the provision for BHL's accounts receivable over 360 days old and tests that have been denied for reimbursement.  These*

- 34 -

*balances were primarily due from patients. Excluding the allowance for doubtful accounts, SG&A expenses for the second quarter of 2009 were $21.0 million, or 50.7% of revenues, compared to $20.9 million, or 48.9% of revenues in the prior year quarter.*

- *In the second quarter of 2009, allowance for doubtful accounts was $20.1 million, or 48.6% of revenues, and days sales outstanding were 68. Days sales outstanding in the second quarter of 2009 benefitted from the increased provision for allowance for doubtful accounts in the quarter. This compares with allowance for doubtful accounts of $5.1 million, or 11.2% of revenues, and DSO of 98 in the first quarter of 2009.*

\*       \*       \*

**Outlook for 2009**

Celera anticipates that its 2009 financial performance could be affected by various factors, including broad economic pressures and the potential impact on sample volume, reimbursement rates and the healthcare system generally. Subject to the inherent risks and uncertainties that may affect Celera's financial performance, which are detailed in the Forward0-Looking Statements section of this release, Celera expects the following for 2009:

- *Total revenues are anticipated to be $160-170 million and gross margin, as a percentage of revenue, is anticipated to be 66-70%.*

- SG&A expenses are anticipated to be $110-$118 million, which includes the $20.1 million provision for doubtful accounts in the second quarter of 2009, as well as Celera's anticipated incremental investment to increase commercialization efforts around its genetics programs. R&D expenses are anticipated to be $28-$32 million.

- Celera expects to take pre-tax restructuring charges of approximately $4.3 million in the third quarter. These include approximately $3.2 million associated with the Company's recently announced restructuring program and approximately $1.1 million for the closure of its Rockville, MD facility. Total cash outlays related to these charges are expected to be approximately $3.8 million.

- For the second half of 2009, Celera anticipates a loss of $5-$9 million, or $0.06 - $0.11, on a non-GAAP basis, with the loss in the third quarter expected to be $0.05-$0.07 on a non-GAAP basis. This expectation reflects that the anticipated cost savings from the announced restructurings will not be fully realized until the fourth quarter of 2009.

- Due to declining interest rates, interest income is expected to be approximately half of that received in the prior year.

- Amortization of intangibles relating to acquisitions, which are excluded in the determination of non-GAAP earnings per share, are expected to be approximately $5.0 million for the second half of 2009. The Company expects non-cash interest income of $0.5 million for the second half of 2009, which is excluded in the determination of non-GAAP earnings per

- 35 -

share, associated with the accounting for the repayment of Celera's investment in the Abbott alliance.

- For the second half of 2009, the expense associated with equity awards under FAS 123R is expected to be approximately $2.3 million, which represents approximately $0.03 per share included in the determination of Celera's non-GAAP EPS.

**The GAAP Violations**

71.    In addition to monitoring the Company's risk factors, the Company must comply with GAAP and the Statement of Financial Accounting Standards ("SFAS"), which requires Celera to disclose its losses when they are reasonably possible.  SFAS No. 5, ¶1 defines a contingency as "an existing condition, situation, or set of circumstances involving uncertainty as to possible gain…or loss."  The collectability of a company's accounts receivable could lead to a loss contingency.  As such, Celera should have had loss contingencies for its accounts receivables that were uncollectible.  Under SFAS No. 5, ¶8:

An estimated loss from a loss contingency…shall be accrued by a charge to income if *both* of the following conditions are met:

a.  Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.  the amount of loss can be reasonably estimated.

72.    Also, under SFAS No. 5, ¶10, Celera was required to record loss contingencies although one or both of the above conditions were not met if there was a "*reasonable possibility* that a loss or an additional loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made."

73.    Celera, however, failed to take loss provisions that were reasonably possible of becoming a loss.  Defendants were aware or reckless in not being aware, that the future losses would be significant and required larger loss provisions than the Company provided.

74.    Defendants failed to properly reserve for the Company's allowance for doubtful accounts.  Celera's largest business segment was its Lab Services segment, operated through

BHL, which comprised over 60% of its revenue. Celera's Lab Services revenue is highly dependent upon its testing being approved for reimbursement by third-party payors, including private, for-profit health insurance companies and government programs such as Medicare. If a third-party payor denies reimbursement, then the amount owed to Celera is due directly from the patient, which increases Celera's collection costs and risks.

75. Celera has entered into contracts with certain third-party payors to become in-network providers. Revenue from contract payors is based on the contract rate and in the case of Medicare, on published fee schedules. Typically, the contracted rate is at a reduced rate and is lower than the rates paid by non-contract payors. However, revenue from contract payors is more predictable and carries with it less collection risks.

76. The largest portion of Celera's Lab Services revenue is from non-contract payors. Thus, the Company does not have a contracted reimbursement rate and may charge the payor a higher rate. However, the revenue earned carries with it increased risks that the third-party payor may deny the claim. In addition, when certain of Celera's non-contract payors do approve claims, they send the reimbursement payments directly to the patients instead of to Celera. The Company then must collect the outstanding amounts directly from the patients, increasing the amount of time and effort the Company is required to spend to collect on its accounts receivables and increasing the overall probability of the accounts being uncollectible.

77. Defendants had knowledge of these potential billing issues and the significant impact they could have on Company earnings well before the Company disclosed its bad-debt write off. Celera originally included a statement in its February 28, 2008 registration statement regarding the risk surrounding collectability of accounts from parties. When pushed for further disclosure, however, Defendants decided the information was "immaterial," and thus, removed the statement from their filing.

78. According to the February 28, 2008 registration statement, signed and authorized by Ordonez, Jung, Ayers and Belingard, Celera included the following risk warning:

*We must comply with complex billing procedures to receive payment for our clinical laboratory testing services.*

It is customary for providers of clinical laboratory testing services to perform tests in advance of payment and without certainty as to payment. Typically, we are reimbursed, in whole or in part, by third-party payors after providing clinical laboratory testing services. These third-party payors have different billing requirements and typically reimburse us only after we comply with a variety of payor-imposed procedures, including providing the payors with specific patient-related information. *If we do not receive reimbursement from the applicable third-party payor, it is unlikely that we will be able to bill or collect from the patient and, therefore, may not be paid for our services*. . . .

79. On March 18, 2008, the SEC sent Celera a comment letter regarding the filing and requested additional information for the amended S-1 filing. On April 10, 2008, Celera filed the S-1/A registration statement, with the correspondence letters from the SEC, which, spoke in part to the billing procedures:

Q. If you have failed to comply with billing procedures in the past, please state the frequency with which you failed to comply. Please advise or revise this disclosure as may be appropriate.

*A. In response to the Staff's comment, we respectfully submit that the Company believes that healthcare billing errors occur in the ordinary course of business for the healthcare and biotechnology industries and the frequency of such errors experienced by the Company are not unique to the Company. The Company believes that these errors experienced by the Company are immaterial in scope and nature and that the nature and infrequency of these errors do not warrant disclosure of the same, and accordingly, additional disclosure is not required.*

The risk disclosure remained unchanged in the S-1 Registration statement and the S-1/A registration statement. The S-1 and S-1A were authorized by defendants Ordonez, Jung, Ayers and Belingard.

80. On May 1, 2008, Celera filed their S-1/A2 registration statement and correspondence between the SEC and the company. In regards to the billing procedures and payments form third parties, Celera stated the following:

Q. We note your response to Comment 19 and reissue the comment. If you believe that billing errors are immaterial in scope and nature, it is unclear why you added this risk factor to your filing. Please either remove this risk factor, or revise your disclosure to state the frequency with which you have failed to comply with billing procedures in the past. This additional disclosure is necessary, as it informs the reader the rate at which your company is not paid for services provided.

*A. In response to the Staff's comment, we have removed the risk factor from the Registration Statement.*

1   The risk factor was not included in the registration statement filed by Celera.

2        81.    Additionally, knowledge of billing issues was widespread amongst the

3   Company.  In January 2010, BHL filed a lawsuit against a competitor, HDL, and seven former

4   BHL employees alleging contractual, tort, and statutory claims against defendants, *Berkeley*

5   *Heartlab, Inc. v. Health Diagnostic Laboratory, Inc., et al*, No. 3:10-cv-00030-REP.

6   Specifically, BHL alleged that each defendant breached their fiduciary duty by engaging in a

7   scheme to steal property, clients, trade secrets and proprietary information in violation of their

8   agreements executed with BHL upon employment.  Declarations submitted by several former

9   BHL employees and physicians noted the billing and collection issues as the primary reason

10   the physicians had stopped using BHL testing services.  These declarations also stated that

11   billing and collection issues arose as early as October 2007, when Celera purchased BHL and

12   when BHL no longer received direct reimbursement from insurers.  Details provided in this

13   litigation also indicate that Celera had been trying to collect account receivables from patients

14   by sending letters that appeared to be invoices with information about the total outstanding

15   balance, causing significant confusion amongst patients.  These actions further contributed to

16   doctors ceasing to use BHL testing services.

17        82.    Ruth Buchanan, a former Clinical Educator who worked at BHL between

18   August 2005 and January 2005, provided testimony stating that physicians at practices she

19   serviced stopped ordering laboratory tests from BHL because they were "frustrated by the

20   billing issues relating to [BHL] and did not want their patients to have to pay high deductibles

21   and uncovered tests."

22        83.    Another Clinical Educator who worked at BHL between August 2004 and

23   December 2009, Stacey Barnes, provided testimony that billing issues arose related to Blue

24   Cross patient billing in October 2007.  Barnes further testified that she began receiving calls

25   from physicians' offices in early 2008 asking for assistance in resolving their patients billing

26   issues.  Specifically:

27         "Patients were not sure what to do with the checks they received from Blue Cross.

28         Some sent checks to [BHL], others did not.  Some patients' accounts were not

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

credited after they sent the checks to BHL. Later, in an effort to resolve the issue, [BHL] began sending letters to patients that informed the patients that if they received payment from Blue Cross, they should send the payment to [BHL]. The letters looked like invoices and the top of the page contained the retail amount for the laboratory tests."

Barnes also testified that numerous physicians began sending laboratory tests to competing labs as a result of the billing issues.

84.     Defendants reported the Company's allowance for doubtful accounts as a percent of its gross receivables at 17.7% for the quarter ending June 30, 2008. Then, Defendants permitted Celera to repeatedly assure investors that the Company would be able to increase the amount of its Lab Services business that was under contract, thus making its ability to collect on its receivables more predictable and less costly and time consuming. Defendants further allowed Celera to assure investors that the Company was adequately reserving for its bad debts. Despite these assurances, by the quarter ending June 27, 2009, the Company's allowance as a percentage of its gross receivables had jumped to an astounding 55.9%, having a material adverse impact on the Company's operations.

85.     Defendants similarly permitted the Company's related bad debt expense to be manipulated. For the quarter ending June 30, 2008, the Company recorded $4.3 million in bad debt expense, which represented 10.1% of its revenue for the period. By August, the Company announced that it had increased its bad debt expense dramatically to $20.1 million for the quarter ended June 27, 2009, which represented 48.6% of its revenue for the period. By comparison, the industry norm for bad debt expense as a percentage of revenue for a comparable lab services business of Celera's size is in the high single-digit to low double-digit range.

86.     The dramatic increase was primarily due to the provision for BHL's accounts receivables over 360 days old and for tests that were denied for reimbursement by a third-party payor. Celera announced that it had made the decision to write off all accounts over 360 days old. Celera further announced that it had decided to write off all accounts where a third-party insurer had previously denied reimbursement for lab services and the amounts outstanding

- 40 -

1    were not due from the patients themselves.  In general, receivables owed directly from a patient

2    carry a greater credit risk than a receivable owed from a private insurance company.

3          87.     In addition, Celera admitted that it was having difficulty in its billing and

4    collection process due to its outdated legacy billing system.  A portion of Celera's uncollectible

5    accounts were attributable to the lack of or inaccurate billing information.

6          88.     The Company committed a second GAAP violation regarding its accounting for

7    goodwill.  The Company was also obligated to comply with the GAAP provision requiring "the

8    excess of the cost of an acquired entity over the net of the amounts assigned to assets acquired

9    and liabilities assumed shall be recognized as an asset referred to as goodwill."  SFAS No. 141,

10   ¶43.  Celera carried millions of dollars worth of an intangible asset commonly known as

11   "goodwill" on its financial statements.  On August 11, 2009, the Company announced that it

12   would have to write off $15.7 million of its goodwill because of various factors that

13   Defendants were aware of well before Celera disclosed the information.  More than 94% of

14   this write-down came from BHL and the Lab Services segment that Defendants had been

15   "pleased" with merely months before.

16         89.     Under GAAP, intangible assets such as good will must be tested for impairment

17   at least annually and "more frequently if events or changes in circumstances indicate the asset

18   might be impaired."  SFAS No. 142, ¶17.  Because Defendants failed to comply with GAAP,

19   they caused the Company to file financial statements in violations of laws, rules, and

20   regulations.

21   **Defendants Breached their Fiduciary Duties During the Relevant Time Period**

22         90.     The true facts, which were known by or available to the Defendants during the

23   Relevant Time Period, were:

24              a.     Celera was not adequately reserving for its allowance for bad debts in

25   violation of GAAP, causing its financial results to be materially misstated;

26              b.     The Company had failed to maintain effective internal controls with

27   respect to its billing and collections processes; and

28

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

    c.  The Company could not substantially increase its Lab Services contracts with third-party insurance payors in an amount sufficient to off-set its existing bad debt expense or reduce its exposure to uncollectible account receivables.

    d.  The Company had widespread billing and collection issues, severely hampering the Company's ability to obtain reimbursement and causing numerous physicians to cease using BHL services.

  91.  Defendants, by reason of their positions as the directors of the Company, and in accordance with applicable law, had and continue to have a fiduciary duty to act in good faith in controlling, managing, overseeing and directing the business, operations and management of Celera to ensure that their operations and activities were and are in full compliance with the federal and state laws and regulations under which the Company operates. Defendants failed to act in good faith throughout the Relevant Time Period and permitted the fraudulent misrepresentations described herein to be publicly disclosed and remain un-remedied for more than a year.

  92.  Indeed, as sophisticated business people with extensive executive and management experience in publicly traded companies, Defendants were each aware of basic concepts of internal controls as applied to complex business organizations, as well as of the importance of adequate and effective systems to ensure corporate compliance with applicable laws and regulations.

  93.  Although armed with knowledge of or access to the facts concerning the Company's Lab Services contracts billing and reimbursement; its existing bad debt; and its available reserves for bad debt, Defendants did not take any effective steps, prior to the July 22, 2009 corrective disclosure, to ensure that Celera was in full compliance with GAAP as well as all relevant securities laws.

  94.  In violation of their fiduciary duties, Defendants permitted and/or caused Celera to issue false and misleading information. Defendants' conduct, as detailed more fully herein, involves a knowing, culpable, and/or reckless violation of their obligations as directors of Celera, an absence of good faith on their part, and a blatant disregard for their duties to the

1  Company and its shareholders.  Defendants knew or recklessly disregarded the substantial risk

2  of economic and reputational injury the Company has and will continue to face as a result of

3  Defendants' illegal acts.

4  **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

5  95.   Plaintiffs bring this action derivatively in the right and for the benefit of Celera

6  to redress injuries suffered, and to be suffered, by Celera as a direct result of the breaches of

7  fiduciary duty, waste of corporate assets, and unjust enrichment, as well as aiding and abetting

8  thereof, by the Defendants.  Celera is named as a nominal defendant solely in a derivative

9  capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not

10  otherwise have.

11  96.   Plaintiffs will adequately and fairly represent the interests of Celera in enforcing

12  and prosecuting its rights.

13  97.   Plaintiffs were owners of Celera common stock at the time of the wrongdoing

14  complained of, have continually been shareholders since that time, and are currently Celera

15  shareholders.

16  98.   Celera's board of directors as of the commencement of this litigation consisted

17  of the following eight individuals:  defendants Ayers, Belingard, Green, Hutt, Naughton,

18  Ordonez, Roe and Shapiro.

19  99.   Plaintiffs have not made any demand on Celera's present board to institute this

20  action because such a demand would be a futile, wasteful, and useless act, because the

21  Defendants suffer from the following disabling conflicts that prevent them from considering

22  demand:

23  a.   Defendant Ordonez is Chief Executive Officer of Celera and breached

24  her fiduciary duties of loyalty and good faith by making false and misleading statements

25  regarding Celera's bad debt expenses and ability to collect a significant portion of its account

26  receivables.  Significantly, Ordonez executed the Registration Statement containing the false

27  and misleading statements complained of herein, and faces substantial liability for breaching

28  her fiduciary duties of loyalty and good faith to Celera.  In addition, Ordonez is incapable of

considering a demand to commence and vigorously prosecute this action because her principal professional occupation is her employment with Celera for which she receives significant compensation; approximately $1,576,632 in 2009; more than double her total 2008 compensation of $688,970;

        b.     Defendant Ayers is a member of the Audit and Finance Committee. The Audit Committee's Charter provides that it is responsible for reviewing and approving the Company's earnings press releases, quarterly and annual financial statements, and the Company's risk exposure. Thus, Ayers, as a member of the Audit and Finance Committee was responsible for overseeing and directly participating in the dissemination of the Company's false and misleading press releases and financial statements. Despite his knowledge Ayers approved the dissemination of the improper statements alleged above, a breach of his fiduciary duties. Accordingly, Ayers faces substantial liability for breaching his fiduciary duties of loyalty and good faith to Celera, and demand upon him would be futile. Ayers is also a member of the Compensation Committee. As a member of the Compensation Committee, Ayers cannot reasonably consider a demand because he awarded lucrative compensation packages to Ordonez at the same time Ordonez was making the fraudulent statements in violation of securities laws and severely damaging the Company. Due to his poor oversight, Ayers is conflicted and faces a substantial likelihood of liability for his breaches of fiduciary duty to Celera. In addition, Ayers sold 10,339 shares of his Celera stock for proceeds of $119,578 during the Relevant Time Period. Ayers has also worked with defendant Ordonez for more than ten years, including time spent working as a subordinate to Ordonez at Applera, and cannot act independently with respect to a demand to hold Ordonez liable for her fraudulent misstatements on behalf of the Company.

        c.     Defendant Belingard also breached his fiduciary duties to the Company by making false and misleading statements in Celera's March 25, 2010 Form 10-KT, which he executed. Like defendant Ayers, Defendant Belingard sold 21,428 shares of his Celera stock during the Relevant Time Period for proceeds of $247,832. Belingard is also chair of the Compensation Committee. As chair of the Compensation Committee, Belingard cannot

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

1   reasonably consider a demand because he awarded lucrative compensation packages to

2   Ordonez at the same time Ordonez was making the fraudulent statements in violation of

3   securities laws and severely damaging the Company.  Due to his poor oversight, Belingard is

4   conflicted and faces a substantial likelihood of liability for his breaches of fiduciary duty to

5   Celera.  Defendant Belingard has worked with Ordonez for more than 19 years, including time

6   spent working as a subordinate to Ordonez at both Applera and Hoffmann-La Roche, and

7   cannot act independently with respect to a demand to hold Ordonez liable for her fraudulent

8   misstatements on behalf of the Company.  Further, in addition to his duties at Celera, Belingard

9   is Chairman and Chief Executive Officer of Ipsen S.A..  As a result of his affiliation with

10  Ipsen, S.A., Belingard is beholden to Ordonez and the rest of the Board who caused Celera to

11  establish a collaboration with a subsidiary of Ipsen S.A., Societe de Conseils, de Recherche et

12  d'Applications Scientifiques SAS, to develop biomarker and pharmacogenomic tests for

13  patients with growth failure;

14          d.      Defendant Green also breached his fiduciary duties to the Company by

15  making false and misleading statements in Celera's March 25, 2010 Form 10-KT, which he

16  executed.  In addition, Green is or was a member of Celera's Audit and Finance Committee.

17  The Audit Committee's Charter provides that it is responsible for reviewing and approving the

18  Company's earnings press releases, quarterly and annual financial statements, and the

19  Company's risk exposure.  Thus, Green, as a member of the Audit and Finance Committee,

20  was responsible for overseeing and directly participating in the dissemination of the Company's

21  improper press releases and financial statements.  Despite his knowledge, Green approved the

22  dissemination of the false and misleading statements identified herein.  Accordingly, Green

23  faces substantial liability for breaching his fiduciary duties of loyalty and good faith to Celera,

24  and demand upon him would be futile.

25          e.      Defendant Hutt also breached his fiduciary duties to the Company by

26  making false and misleading statements in Celera's March 25, 2010 Form 10-KT, which he

27  executed.  Hutt is also a member of the Nominating and Corporate Governance Committee.

28  The Nominating and Corporate Governance Committee evaluates Celera's Board of Directors'

CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

effectiveness and generally takes a leadership role in advising the Board of Directors on corporate governance and related matters.   The Nominating and Corporate Governance Committee is also responsible for the general oversight of the Company's ethical conduct and compliance with laws and regulations applicable to Celera's business.  Hutt, however, utterly failed in his monitoring of the Company's inadequate corporate governance, which permitted the violations of the securities laws for which Celera is being sued, and the breaches of fiduciary duties complained of herein.  Celera has been damaged as a result of the stunning lack of oversight by defendant Hutt, such that he is not only conflicted, but faces a substantial likelihood of liability for his breaches of fiduciary duty to Celera and cannot reasonably consider demand.  In addition, defendant Hutt serves with defendant Roe not only as a director of Celera, but also as directors of ISTA Pharmaceuticals, and previously as directors of Favrille, Inc..  Defendant Hutt also serves with defendant Shapiro as a director of Momenta Pharmaceuticals.

f.       Defendant Naughton also breached her fiduciary duties to the Company by making false and misleading statements in Celera's March 25, 2010 Form 10-KT, which she executed.  In addition, Naughton is or was a member of Celera's Audit and Finance Committee. The Audit Committee's Charter provides that it is responsible for reviewing and approving the Company's earnings press releases, quarterly and annual financial statements, and the Company's risk exposure.  Thus, Naughton, as a member of the Audit and Finance Committee, was responsible for overseeing and directly participating in the dissemination of the Company's improper press releases and financial statements.  Despite her knowledge, Naughton approved the dissemination of the false and misleading statements identified herein.   Accordingly, Naughton faces substantial liability for breaching her fiduciary duties of loyalty and good faith to Celera, and demand upon her would be futile.  Naughton is also a member of the Nominating and Corporate Governance Committee.   The Nominating and Corporate Governance Committee evaluates Celera's Board of Directors' effectiveness and generally takes a leadership role in advising the Board of Directors on corporate governance and related matters.  The Nominating and Corporate Governance Committee is also responsible for the

general oversight of the Company's ethical conduct and compliance with laws and regulations applicable to Celera's business.  Naughton, however, utterly failed in her monitoring of the Company's inadequate corporate governance, which permitted the violations of the securities laws for which Celera is being sued, and the breaches of fiduciary duties complained of herein. Celera has been damaged as a result of the stunning lack of oversight by defendant Naughton, such that she is not only conflicted, but faces a substantial likelihood of liability for her breaches of fiduciary duty to Celera and cannot reasonably consider demand.

g.      Defendant Roe also breached his fiduciary duties to the Company by making false and misleading statements in Celera's March 25, 2010 Form 10-KT, which he executed.  In addition, Roe is or was a member of Celera's Audit and Finance Committee.  The Audit Committee's Charter provides that it is responsible for reviewing and approving the Company's earnings press releases, quarterly and annual financial statements, and the Company's risk exposure.  Thus, Roe, as a member of the Audit and Finance Committee, was responsible for overseeing and directly participating in the dissemination of the Company's improper press releases and financial statements.  Despite his knowledge, Roe approved the dissemination of the false and misleading statements identified herein.  Accordingly, Roe faces substantial liability for breaching his fiduciary duties of loyalty and good faith to Celera, and demand upon him would be futile.  In addition, defendant Roe serves with defendant Hutt not only as a director of Celera, but also as directors of ISTA Pharmaceuticals, and previously as directors of Favrille, Inc..

h.      Defendant Shapiro also breached his fiduciary duties to the Company by making false and misleading statements in Celera's March 25, 2010 Form 10-KT, which he executed.   In addition, Shapiro is a member of the Nominating and Corporate Governance Committee.  The Nominating and Corporate Governance Committee evaluates Celera's Board of Directors' effectiveness and generally takes a leadership role in advising the Board of Directors on corporate governance and related matters.  The Nominating and Corporate Governance Committee is also responsible for the general oversight of the Company's ethical conduct and compliance with laws and regulations applicable to Celera's business.  Shapiro,

however, utterly failed in his monitoring of the Company's inadequate corporate governance, which permitted the violations of the securities laws for which Celera is being sued, and the breaches of fiduciary duties complained of herein.  Celera has been damaged as a result of the stunning lack of oversight by defendant Shapiro, such that he is not only conflicted, but faces a substantial likelihood of liability for his breaches of fiduciary duty to Celera and cannot reasonably consider demand.  Shapiro is also a member of the Compensation Committee.  As a member of the Compensation Committee, Shapiro cannot reasonably consider a demand because he awarded lucrative compensation packages to Ordonez at the same time Ordonez was making the fraudulent statements in violation of securities laws and severely damaging the Company.  Due to his poor oversight, Shapiro is conflicted and faces a substantial likelihood of liability for his breaches of fiduciary duty to Celera.  In addition to serving as a director of Celera, defendant Shapiro also serves as a director of Momenta Pharmaceuticals with defendant Hutt.

100.    Indeed, each of defendants Ayers, Belingard, Green, Hutt, Naughton, Ordonez, Roe and Shapiro, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent them from taking the necessary and proper action on behalf of Celera as requested herein.  In addition to the foregoing, each of these defendants are subject to the following prejudicial entanglements:

a.    They completely and utterly failed to exercise oversight of the Company's business, including its internal controls.  Given its length of time and magnitude these defendants utterly failed to oversee the Company's financial prospects, including its allowance for losses, bad debt, the amount of goodwill the Company carried, and earnings guidance.  Thus, each of these defendants face a substantial likelihood of liability for breaching their fiduciary duties to Celera, acts incapable of ratification;

b.    Each of these defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Celera's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested

- 48 -

1  parties and could not fairly and fully prosecute this suit even if such a suit was instituted by

2  them;

3          c.      Defendant Ordonez and nominal defendant Celera are defendants in a

4  securities fraud class action lawsuit which alleges false and misleading statements similar to

5  those above.  If these defendants pressed forward with their right of action against defendant

6  Ordonez in this action, then the Company's efforts would compromise defendant Ordonez's

7  defense in the federal securities fraud class action; and

8          d.      If Celera's current and past officers and directors are protected against

9  personal liability for their acts of mismanagement, abuse of control and breach of fiduciary

10  duty alleged in this Complaint by directors' and officers' liability insurance, they caused the

11  Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies

12  belonging to the stockholders of Celera.  However, the directors' and officers' liability

13  insurance policies covering the Defendants contain provisions that eliminate coverage for any

14  action brought directly by Celera against these Defendants, known as, *inter alia*, the "insured

15  versus insured exclusion."  As a result, if these defendants were to cause Celera to sue

16  themselves or certain of the officers of Celera, there would be no directors' and officers'

17  insurance protection and is, thus, a further reason why they will not bring such a suit.  On the

18  other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage

19  exists and will provide a basis for the Company to effectuate recovery.  If there isn't any

20  directors' and officers' liability insurance, then the current directors will not cause Celera to sue

21  them, since they will face a large uninsured liability.

22          **<u>COUNT I</u>**

23      **<u>Against All Defendants for Breach of Fiduciary Duty</u>**

24          101.    Plaintiffs incorporate by reference and reallege each and every allegation

25  contained above, as though fully set forth herein.

26          102.    Defendants owed and owe Celera fiduciary obligations.  By reason of their

27  fiduciary relationships, Defendants owed and owe Celera the highest obligation of fair dealing,

28  loyalty and due care.

103.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, and supervision.

104.    Each of the Defendants had actual or constructive knowledge that they had caused or allowed the Company to mislead its investors.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

105.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Celera has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

106.    Plaintiffs, on behalf of Celera, have no adequate remedy at law.

## COUNT II

### Against All Defendants for Unjust Enrichment

107.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

108.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Celera, by receiving director and executive compensation and other benefits from the Company.

109.    Plaintiffs, as a shareholders and representatives of Celera, seek restitution from the Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

110.    Plaintiffs, on behalf of Celera, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

1      B.     Directing Celera to take all necessary actions to reform and improve its

2  corporate governance and internal procedures to comply with applicable laws and to protect

3  Celera and its shareholders from repeating the damaging events described herein, including,

4  but not limited to, putting forward for shareholder vote resolutions for amendments to the

5  Company's By-Laws or Articles of Incorporation and taking such other action as may be

6  necessary to place before shareholders a vote for Corporate Governance Policies that include:

7  (i) a proposal to remove from the Board those members who have breached their fiduciary

8  duties to Celera; (ii) a proposal to strengthen the Company's controls over financial reporting;

9  (iii) a proposal to strengthen the Board's supervision of operations and develop and implement

10 procedures for greater shareholder input into the policies and guidelines of the Board; (iv) a

11 provision to permit the shareholders of Celera to nominate candidates for election to the Board;

12 and (v) a proposal to strengthen Celera's oversight of its disclosure procedures.

13     C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and

14 state statutory provisions sued hereunder, including attaching, impounding, imposing a

15 constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or

16 their other assets to assure that plaintiffs, on behalf of Celera, have an effective remedy;

17     D.     Awarding Celera restitution from the Defendants, and each of them, and

18 ordering disgorgement of all profits, benefits and other compensation obtained by the

19 Defendants;

20     E.     Awarding Plaintiffs the costs and disbursements of the action, including

21 reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

22     F.     Granting such other and further relief as the Court deems just and proper.

23                              **JURY DEMAND**

24 Plaintiffs demand a trial by jury.

25 DATED: October 15, 2010                    ROBBINS UMEDA LLP
                                             MARC M UMEDA
26                                           GEORGE C. AGUILAR
                                             JULIA M. WILLIAMS
27

28                                                s/George C. Aguilar
                                             GEORGE C. AGUILAR
                              - 51 -
CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT    CASE NO. CV 10-02935 JW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

600 B Street, Suite 1900
San Diego, California 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
E-mail: mumeda@robbinsumeda.com
            gaguilar@robbinsumeda.com
            jwilliams@robbinsumeda.com

GARDY & NOTIS, LLP
MARK C. GARDY
JENNIFER SARNELLI
KELLY A. NOTO
560 Sylvan Avenue
Englewood Cliffs, NJ 07632
Telephone:  (201) 567-7377
Facsimile:  (201) 567-7337
E-mail: mgardy@gardylaw.com
            jsarnelli@gardylaw.com
            knoto@gardylaw.com

Co-Lead Counsel for Plaintiffs

HAROLD B. OBSTFELD, P.C.
HAROLD B. OBSTFELD
100 Park Avenue, 20th Floor
New York, NY 10017
Telephone: (212) 696-1212
Facsimile: (212) 696-1398
E-mail: hobsd@erols.com

Counsel for Plaintiff Alan R. Kahn

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on October 15, 2010, I electronically filed the foregoing with the

3   Clerk of Court using the CM/ECF system which will send notification of such filing to the e-mail

4   addresses on the Electronic Mail Notice List.  I hereby certify that I have sent notification and

5   served a copy of the filing via U.S. mail to the following parties listed below.

6        **VIA U.S. MAIL**

7
    Harold B. Obstfeld                                Mark C. Gardy
8   HAROLD B. OBSTFELD, P.C.                           James S. Notis
    100 Park Avenue, 20th Floor                        Kelly A. Noto
9   New York, NY 10017                                 GARDY & NOTIS, LLP
                                                       560 Sylvan Avenue
10                                                     Englewood Cliffs, NJ 07632

11  Patrick E. Gibbs
    John C. Tang
12  Andrew M. Farthing
    LATHAM & WATKINS LLP
13  140 Scott Drive
    Menlo Park CA 94025
14

15

16        I certify under penalty of perjury under the laws of the United States of America that the

17  foregoing is true and correct. Executed on October 15, 2010.

18
                                              s/George C. Aguilar
19                                            GEORGE C. AGUILAR

20

21

22

23

24

25

26  541126

27

28

- 53 -
CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT     CASE NO. CV 10-02935 JW

# Mailing Information for a Case 5:10-cv-02935-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **George Carlos Aguilar**
  GAguilar@robbinsumeda.com,Notice@robbinsumeda.com

- **Mark C. Gardy**
  mgardy@gardylaw.com

- **Judson Earle Lobdell**
  jlobdell@mofo.com,mblackmer@mofo.com

- **James S. Notis**
  jnotis@gardylaw.com

- **Jennifer Sarnelli**
  jsarnelli@gardylaw.com

- **Marc M. Umeda**
  MUmeda@robbinsumeda.com,notice@robbinsumeda.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Kelly A. Noto
Gardy & Notis LLP
560 Sylvan Avenue
Englewood Cliffs, NJ 07632

Harold B. Obstfeld
Harold B. Obstfeld P.C.
100 Park Avenue, 20th Floor
New York, NY 10017

Julia M. Williams
Robbins Umeda LLP
600 B Street
Suite 1900
San Diego, CA 92101
```

1

## VERIFICATION

2        I, Alan R. Kahn, hereby verify that I am a plaintiff in the within action and have read

3   the foregoing complaint and know the contents thereof, except as the matters therein stated to

4   be alleged on information and belief, and as to those matters, I believe them to be true.  I have

5   been a shareholder of Celera Corporation at times relevant to the complaint and am a current

6   shareholder of Celera Corporation.

7   Dated: October /5 , 2010

8

9                                                    ALAN R. KAHN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Dr. Betty Z. Greenberg, hereby declare as follows:

I am the plaintiff in the within entitled action and a shareholder of Celera Corporation. I have been a shareholder continuously since September 3, 1999. I have retained competent counsel and I am ready, willing and able to pursue this action vigorously on behalf of the Company. I have read the Consolidated Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment (the "Complaint"), and know the contents of it. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____

_____
DR. BETTY Z. GREENBERG